Townsend v Vaisman (2022 NY Slip Op 02148)





Townsend v Vaisman


2022 NY Slip Op 02148


Decided on March 30, 2022


Appellate Division, Second Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on March 30, 2022
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

FRANCESCA E. CONNOLLY, J.P.
CHERYL E. CHAMBERS
JOSEPH A. ZAYAS
DEBORAH A. DOWLING, JJ.


2018-03060
 (Index No. 6476/15)

[*1]Katrina Townsend, appellant,
v
Alex Vaisman, etc., et al., respondents.


Krentsel, Guzman & Herbert, LLP, New York, NY (Marcia Raicus of counsel), for appellant.
Martin, Clearwater & Bell, LLP, East Meadow, NY (Gregory A. Cascino, Kenneth R. Larywon, and Karen B. Corbett of counsel), for respondents.



DECISION & ORDER
In an action to recover damages for medical malpractice, the plaintiff appeals from an order of the Supreme Court, Queens County (Peter J. O'Donoghue, J.), dated December 18, 2017. The order granted the defendants' motion for summary judgment dismissing the complaint.
ORDERED that the order is affirmed, with costs.
In this action to recover damages for medical malpractice, the plaintiff testified at her deposition that on June 21, 2014, she woke up at 5:00 a.m. feeling dizzy. She testified that she "knew something was wrong right away." Nevertheless, the plaintiff ate breakfast and went to work. Around 11:30 a.m., the plaintiff told her supervisor she was not feeling well and took a taxi back home. She slept from approximately 1:00 p.m. until about 8:00 p.m., but still was not feeling any better. When the plaintiff tried to stand up, she realized "it was much worse than what it was earlier that day," so she decided to call an ambulance. She told the emergency medical services personnel that she had been feeling dizzy since 5:00 a.m.
The plaintiff was taken to the emergency room at the defendant Jamaica Hospital Medical Center (hereinafter JHMC), accompanied by her aunt. The plaintiff arrived at JHMC at 9:47 p.m. and told the nurses there that she had been feeling dizzy since 5:00 a.m. At triage, the plaintiff was given an urgency score of 3 on a scale from 1 to 5, indicating a "mild to moderate" urgency.
Jasmine Lachman, the nurse who first examined the plaintiff after she was triaged, testified at her deposition that she assessed the plaintiff's level of consciousness, alertness to time and place, and cognition, as well as her speech. Lachman testified that she had no concern that the plaintiff was exhibiting any sign or symptom of a stroke.
The plaintiff was next seen by the defendant Alex Vaisman at 11:30 p.m. Vaisman testified at his deposition that he tested the plaintiff for anemia, infection, and dehydration, and noted that she was hyperventilating and anxious. Vaisman prescribed Meclizine for the plaintiff's dizziness and Ativan for her anxiety. Vaisman testified that, during the time he treated the plaintiff, [*2]he had no concern about possible neurological problems, did not consider requesting a neurological consultation, and did not consider prescribing radiological studies, because the plaintiff "did not have any neurologic deficit on physical examination." Vaisman observed no signs or symptoms consistent with a stroke, such as slurred speech, facial asymmetry, or one-sided weakness. According to Vaisman, the plaintiff did not present with "any symptoms of a stroke."
The plaintiff was discharged at approximately 1:00 or 2:00 a.m. and was told to go home and rest for a couple of days. The plaintiff testified that she was unable to walk straight and kept "walking into everything." She went home and went to bed.
The plaintiff testified at her deposition that, when she woke up at approximately 9:00 a.m. the next morning, she was still dizzy. Around noon, she tried to get up to go to the bathroom, but was so dizzy she had to hold on to the walls to make it there, and her fiancé had to help her back to the bed. The plaintiff then sat on the side of the bed and tried to write her name, but she couldn't make out her signature. The plaintiff dozed off, and when she later tried to get up, her right leg gave out and she fell. Her fiancé called an ambulance at approximately 3:30 or 4:00 p.m. The plaintiff arrived at Queens Hospital Center at approximately 4:25 p.m. By that time, the plaintiff's speech was slurred. She was sent for a CT scan immediately after triage and was later informed that she had suffered a stroke. The plaintiff testified that the doctors at Queens Hospital Center told her that "whatever symptoms [she] had the day before, that's more or less when [she] had the stroke."
The plaintiff commenced this action against Vaisman and JHMC to recover damages for medical malpractice. The plaintiff's specific malpractice allegations, as stated in her bill of particulars, were that the defendants were negligent in "failing to diagnose plaintiff's stroke," "negligently failing to diagnose plaintiff's signs and symptoms of stroke," "failing to administer thrombolytic therapy," and "failing to administer [tissue plasminogen activator]" (hereinafter TPA).
The defendants moved for summary judgment dismissing the complaint. The Supreme Court granted the motion, finding that the defendants satisfied their prima facie burden, and that in opposition, the plaintiff failed to raise a triable issue of fact. The plaintiff appeals.
A physician moving for summary judgment dismissing a complaint alleging medical malpractice must establish, prima facie, either that there was no departure from accepted standards of medical care or that any departure was not a proximate cause of the plaintiff's injuries (see Bacalan v St. Vincents Catholic Med. Ctrs. of N.Y., 179 AD3d 989, 991; Stukas v Streiter, 83 AD3d 18, 23-25). "In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars" (Bacalan v St. Vincents Catholic Med. Ctrs. of N.Y., 179 AD3d at 991-992).
Here, in support of their motion, the defendants submitted an expert affirmation from a board-certified expert in emergency medicine, critical care medicine, pulmonary medicine, and internal medicine, along with the medical records and deposition transcripts he reviewed. Based on his experience and his review of the relevant materials, the expert opined, in relevant part, that the plaintiff suffered an ischemic stroke in the thalamus prior to 5:00 a.m. on June 21, 2014. In particular, the expert noted that the plaintiff's "deposition testimony, the JHMC records, the ambulance call reports and the Queens Hospital Center records are all consistent. Each of these sources, including each of these medical records as well as [the plaintiff's] own testimony, confirm that [the plaintiff] reported that her first symptom of stroke, the onset of dizziness, was noted at 5:00 a.m. on June 21, 2014. She also testified that she had not been dizzy when she went to bed around midnight on June 20th. Since she was sleeping between midnight and 5:00 a.m. on June 21, 2014, the onset of the stroke occurred at some time in those early morning hours before 5:00 a.m."
The expert further opined that, "[w]hen an ischemic stroke is diagnosed, there are two potential treatments available that may improve a patient's chances for a good neurological outcome, including intravenous TPA or catheter directed intra-arterial therapy." The expert explained that TPA is a drug that may help dissolve a clot, but that if the drug is administered outside the recommended time window, "the potential for harm far exceeds any potential benefit." The expert [*3]opined that, by the time the plaintiff presented to JHMC on the evening of June 21, 2014, approximately 16 hours after the onset of her dizziness, treatment with TPA was not an option since the then 3-hour window for the administration of TPA had long passed. Thus, even if the plaintiff's stroke had been diagnosed at JHMC on June 21, 2014, treatment with TPA would not have been indicated, and may well have caused more harm than good. In fact, the expert opined that the administration of TPA therapy at JHMC under these circumstances would have been a deviation from good and accepted medical practice and could have induced brain hemorrhage or even death.
Although not expressly included in the plaintiff's pleadings, the defendants' expert also addressed the potential for treatment with catheter directed intra-arterial therapy, the second of the two potential treatments for a stroke that were identified by the defendants' expert. The defendants' expert explained that this treatment "is only of benefit when instituted within a 6-hour time window," and only for certain types of strokes, and that here, by the time the plaintiff presented to JHMC, she was outside the time window for this type of treatment as well.
In light of the above, the defendants' expert opined that "had the stroke been diagnosed at JHMC, [the plaintiff's] outcome would have been the same, as TPA or catheter based therapies were not an option based upon the time of presentation." The defendants' expert further opined that the plaintiff "did not lose the opportunity to receive treatment due to her stroke not being diagnosed at JHMC, as the only potential treatment might have [been] TPA," and the plaintiff "was not a candidate for TPA simply because she presented to JHMC more than 16 hours after the onset of symptoms." The defendants' expert further asserted that "[n]othing that was done or not done caused or contributed to [the plaintiff's] alleged injuries." While we agree with our dissenting colleague that this assertion in itself is not sufficiently specific to satisfy the defendants' prima facie burden, this general opinion is supported by the defendants' expert's other specific opinions set forth above. Given the defendants' expert's detailed opinion that the potential treatments for an ischemic stroke were no longer available to the plaintiff at the time she presented at JHMC, we disagree with our dissenting colleague's suggestion that the defendants failed to meet their prima facie burden due to the defendants' expert's failure to address specifically the plaintiff's right-sided paralysis or other injuries which allegedly developed after Vaisman's failure to diagnose the stroke.
The defendants' expert stopped short of expressly refuting the plaintiff's allegation that the defendants departed from the acceptable standard of care by failing to diagnose the plaintiff's stroke on June 21, 2014. Instead, he simply offered that "general fatigue and dizziness, in the absence of any other signs of stroke, are not strongly suggestive of stroke." Thus, the main thrust of the expert's opinion was that it was too late to administer TPA therapy by the time the plaintiff presented at JHMC, so nothing more could have been done even if the stroke had been diagnosed at that time.
When viewed in light of the plaintiff's specific allegations of malpractice, the expert's opinion established, prima facie, that any alleged departure in failing to diagnose the plaintiff's stroke on June 21, 2014, was not a proximate cause of the plaintiff's injuries, and that the failure to administer thrombolytic therapy such as TPA was not a departure from the accepted standard of care since such therapy could not have safely been administered by the time the plaintiff presented at JHMC.
In opposition, the plaintiff failed to raise a triable issue of fact. Indeed, the plaintiff's expert made no attempt to support the theory of liability alleged in the plaintiff's bill of particulars regarding the defendants' failure to diagnose a stroke or to administer thrombolytic therapy such as TPA to treat the plaintiff's stroke (see Dolan v Halpern, 73 AD3d 1117, 1119). The plaintiff's expert also failed to address the specific opinions expressed by the defendants' expert (see DiLorenzo v Zaso, 148 AD3d 1111, 1114; Dolan v Halpern, 73 AD3d at 1119). Crucially, the plaintiff's expert did not dispute the defendants' expert's opinion that, if the plaintiff did suffer a stroke in the early morning hours of June 21, 2014, then it was too late to treat the plaintiff with TPA by the time she presented at JHMC some 16 hours later. Instead, the plaintiff's expert advanced an entirely new theory of liability for the first time in opposition to the motion. "[A] plaintiff cannot defeat a summary judgment motion that made out a prima facie case by merely asserting, without [*4]more, a new theory of liability for the first time in the opposition papers" (Biondi v Behrman, 149 AD3d 562, 563-564; see Bacalan v St. Vincents Catholic Med. Ctrs. of N.Y., 179 AD3d at 992).
Accordingly, the Supreme Court properly granted the defendants' motion for summary judgment dismissing the complaint.
CONNOLLY, J.P., CHAMBERS and ZAYAS, JJ., concur.
DOWLING, J., dissents, and votes to reverse the order appealed from, on the law, and deny the defendants' motion for summary judgment dismissing the complaint, with the following memorandum:
I respectfully disagree with the conclusion of my colleagues in the majority that the defendants should be granted judgment as a matter of law dismissing the complaint. Therefore, I dissent.
The plaintiff presented to the emergency room of the defendant Jamaica Hospital Medical Center (hereinafter Jamaica Hospital) at approximately 9:47 p.m. on June 21, 2014, complaining of persisting dizziness since approximately 5:00 a.m. that morning. She was seen by the defendant Alex Vaisman, who, despite having noted in the plaintiff's medical records "Neurological: Positive for weakness," and having no information regarding any history of a psychological disorder, seemingly dismissed the plaintiff's complaints and diagnosed her as suffering from "hyperventilation and anxiety." No diagnostic tests to identify the cause of the plaintiff's dizziness were ordered, and the plaintiff was discharged at approximately 1:00 a.m. on June 22, 2014, with a prescription for Ativan, a medication used to treat anxiety. The plaintiff's dizziness continued to worsen after her discharge from Jamaica Hospital on June 22, 2014, and she collapsed in her home hours later, at approximately 3:30 p.m. An ambulance was called and the plaintiff was taken to nonparty Queens Hospital Center. Hospital records from Queens Hospital Center indicate that the plaintiff presented with right-sided weakness, difficulty walking, dizziness, and confusion. A CT scan was performed and the plaintiff was diagnosed as having suffered a stroke. The plaintiff testified at her deposition that the doctors at Queens Hospital Center estimated that the stroke had occurred when she first began experiencing dizziness on June 21, 2014, prior to her admission to Jamaica Hospital. The plaintiff thereafter commenced the instant action against Vaisman and Jamaica Hospital, alleging medical malpractice with respect to the treatment that she received from the defendants on June 21, 2014.
"The elements of a medical malpractice cause of action are a deviation or departure 'from accepted community standards of practice, and that such departure was a proximate cause of the plaintiff's injuries'" (DiLorenzo v Zaso, 148 AD3d 1111, 1112, quoting Stukas v Streiter, 83 AD3d 18, 23). To prevail on a motion for summary judgment in a medical malpractice action, a defendant must make a prima facie showing either that there was no departure or that his or her acts were not a proximate cause of the plaintiff's injuries (see Pinnock v Mercy Med. Ctr., 180 AD3d 1088, 1090; Stukas v Streiter, 83 AD3d at 25; see also Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853). "'In order to sustain this burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's bill of particulars'" (Anonymous v Gleason, 175 AD3d 614, 617, quoting Schwartzberg v Huntington Hosp., 163 AD3d 736, 737). "'Conclusory statements set forth in an affirmation of a medical expert which do not refute or address the specific allegations of negligence made by a plaintiff in his or her complaint and bill of particulars are insufficient to make a prima facie showing that a defendant physician is entitled to judgment as a matter of law'" (Huichun Feng v Accord Physicians, PLLC, 194 AD3d 795, 796, quoting Ross-Germmain v Millennium Med. Servs., P.C., 144 AD3d 658, 659-660; see Winegrad v New York Univ. Med. Ctr., 64 NY2d at 853).
Here, the defendants failed to establish their prima facie entitlement to judgment as a matter of law dismissing the complaint. In her verified bill of particulars, the plaintiff alleged, inter alia, that the defendants had departed from good and accepted medical practice in failing to diagnose her stroke on June 21, 2014, in failing to administer thrombolytic therapy or a treatment known as [*5]"TPA," and in failing to "prevent the worsening of the [plaintiff's] condition." The defendants made no effort to meet their prima facie burden on the departure element, as the defendants' expert did not opine that the failure to diagnose the plaintiff's stroke on June 21, 2014, was not a deviation or departure from accepted community standard of practice. Nor could they under the facts presented on this record, and Vaisman's cavalier diagnosis of anxiety in the face of the plaintiff's complaints, together with the fact that she was 55 years old and overweight, and had a history of other medical conditions, raises concerns as to his apparent failure to treat the plaintiff in accordance with the accepted standard of care. Rather, the defendants' expert merely stated that the symptoms with which the plaintiff presented, namely fatigue and dizziness, "are not strongly suggestive of stroke."
The defendants instead attempted to meet their prima facie burden with respect to causation. To that end, the defendants' expert opined generally that the failure to diagnose the plaintiff's stroke on June 21, 2014, did not result in a loss of opportunity for the plaintiff to receive treatments "that may" have improved the plaintiff's "chances for a good neurological outcome." The defendants' expert explained that the potential treatments identified by the plaintiff in the pleadings "may improve a patient's chances for a good neurological outcome" if administered within 3 hours or 6 hours, respectively, of the initial onset of symptoms. The defendants' expert opined that the onset of the stroke symptoms occurred at approximately 5:00 a.m. on June 21, 2014, when the plaintiff first experienced dizziness. Thus, by the time the plaintiff presented to Jamaica Hospital on the evening of June 21, 2014, approximately 16 hours after she first experienced dizziness, the treatment options which she identified were no longer available. However, the defendants' expert failed to provide an actual or specific opinion as to whether the right-sided paralysis and other injuries which the plaintiff suffered in the afternoon on June 22, 2014, could have been prevented had the plaintiff's stroke been properly diagnosed on June 21, 2014. In fact, the defendants' expert's affirmation makes no reference whatsoever to the injuries sustained by the plaintiff following Vaisman's failure to diagnose the plaintiff's stroke, including the right-sided paralysis that she suffered on June 22, 2014. The general opinion of the defendants' expert that there was no loss of treatment which may have improved the plaintiff's "neurological outcome," and that "[n]othing that was done or not done caused or contributed to [the plaintiff's] alleged injuries," is not sufficiently specific to support a finding that the defendants established their prima facie entitlement to judgment as a matter of law dismissing the complaint.
Accordingly, the Supreme Court should have denied the defendants' motion for summary judgment dismissing the complaint, regardless of the sufficiency of the plaintiff's opposition (see Winegrad v New York Univ. Med. Ctr., 64 NY2d at 853).
ENTER:
Maria T. Fasulo
Clerk of the Court